BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
PATRICIA N. SYVERSON (CA SBN 203111)
MANFRED P. MUECKE (CA SBN 222893)
600 W. Broadway, Suite 900
San Diego, CA 92101
psyverson@bffb.com
mmuecke@bffb.com
Telephone: (619) 798-4593

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
ELAINE A. RYAN (*Admitted Pro Hac Vice*)
CARRIE A. LALIBERTE (*Admitted Pro Hac Vice*)
2325 E. Camelback Rd. Suite 300
Phoenix, AZ 85016
eryan@bffb.com
claliberte@bffb.com
Telephone: (602) 274-1100

SIPRUT PC
STEWART M. WELTMAN (*Admitted Pro Hac Vice*)
MICHAEL CHANG (*Admitted Pro Hac Vice*)
17 North State Street
Chicago, Illinois 60602
sweltman@siprut.com
mchang@siprut.com
Telephone: (312) 236-0000

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSA ALVAREZ, On Behalf of Herself and All Others Similarly Situated,<br><br>         Plaintiff,<br><br>   v.<br><br>NBTY, INC., a Delaware corporation, and NATURE'S BOUNTY, INC., a Delaware corporation,<br><br>         Defendants. | Case No.:  3:17-CV-00567-BAS-BGS<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date: November 26, 2018<br>Courtroom:  4B, Suite 4145<br>Judge: Hon. Cynthia Bashant<br><br>Action Filed:  March 22, 2017<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    COMMON EVIDENCE WILL BE USED TO PROVE THE CLASSES' CLAIMS ..................................................................... 1

    A.    All Products Have the Same Active Ingredient and Their Labels Make the Same Common False and Misleading Representations ................................................................. 1

    B.    Common Evidence Will Be Used to Demonstrate that the Products Do Not Provide Any of the Represented Benefits ............. 2

        **1.**  The IOM in 1998 and in 2006, and the FDA in 2016, set the Daily Recommended Intake (AI) of biotin at 30 mcg per day ................................................................. 2

        **2.**  The science demonstrates that mega-dose biotin supplements are superfluous, unneeded, and pose a risk of harm .................... 4

    C.    The Products are Worthless, Entitling Plaintiff and the Classes to a Full Refund Calculable on a Classwide Basis ........................... 8

II.   LEGAL ARGUMENT ................................................................. 11

    A.    Class Certification Should Be Granted ........................................... 11

    B.    Plaintiff's Proposed Classes ................................................... 11

    C.    Plaintiff Satisfies the Rule 23(a) Prerequisites ................................ 12

        1.  Rule 23(a)(1) – The proposed Classes are numerous ............... 12

        2.  Rule 23(a)(2) – Issues are common .......................................... 12

        3.  Rule 23(a)(3) – Plaintiff's claims are typical ........................... 13

        4.  Rule 23(a)(4) – Plaintiff and her counsel have and will continue to adequately represent the Classes ........................... 14

    D.    Rule 23(b)(3) is Satisfied ................................................... 14

        1.  Predominance is satisfied ....................................................... 15

            a.  Common issues predominate ............................................... 15

MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION

**Page**

       b.  Reliance and causation issues do not defeat Predominance .......................................................17

       c.  Damages can be calculated on a Classwide basis ...............18

       d.  Choice of law issues do not defeat certification of a Multi-State UCL Class .......................................................20

    2.  A class action is the superior method of adjudication...............22

III.    CONCLUSION ...........................................................................22

MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abbit v. ING USA Annuity*
    2015 WL 7272220 (S.D. Cal. Nov. 16, 2015) ...........................................17

*Allen v. Hyland's, Inc.*
    300 F.R.D. 643 (C.D. Cal. 2014) ...............................................................19

*Amchem Prods. v. Windsor, Inc.*
    521 U.S. 591 (1997) ...................................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*
    133 S. Ct. 1184 (2013) .................................................................................8

*Beck-Ellman v. Kaz USA, Inc.*
    283 F.R.D. 558 (S.D. Cal. 2012).................................................................14

*Blackie v. Barack*
    524 F.2d 891 (9th Cir. 1975)................................................................20, 21

*Bruno v. Eckhart Corp.*
    280 F.R.D. 540 (C.D. Cal. 2012) ...............................................................20

*Bruno v. Quten Research Inst., LLC*
    280 F.R.D. 524 (C.D. Cal. 2011) ...............................................................13

*Carnegie v. Household Int'l, Inc.*
    376 F.3d 656 (7th Cir. 2004)................................................................11, 22

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*
    2015 WL 6638929 (N.D. Cal. Oct. 29, 2015)...........................................17

*Comcast Corp. v. Behrend*
    133 S. Ct. 1426 (2013) ...............................................................................19

*Delarosa v. Boiron, Inc.*
    275 F.R.D. 582 (C.D. Cal. 2011) ...............................................................12

*Forcellati v. Hyland's, Inc.*
      2012 WL 2513481 (C.D. Cal. June 1, 2012) ...............................................21

*Forcellati v. Hyland's, Inc.*
      2014 WL 1410264 (C.D. Cal. Apr. 9, 2014)..................................11, 12, 17

*FTC v. Nat'l Urological Grp., Inc.*
      645 F. Supp.2d 1167 (N.D. Ga. 2008) .......................................................17

*F.T.C. v. Pantron I Corp.*
      33 F.3d 1088 (9th Cir. 1994)......................................................................18

*Gartin v. S & M Nutec, LLC*
      245 F.R.D. 429 (C.D. Cal. 2007) ...............................................................15

*Guido v. L'Oreal, USA, Inc.*
      284 F.R.D. 468 (C.D. Cal. 2012) .........................................................13, 18

*Guido v. L'Oreal, USA, Inc.*
      2013 WL 3353857 (C.D. Cal. July 1, 2013) ..............................................12

*Gutierrez v. Wells Fargo Bank NA*
      589 Fed. Appx. 824 (9th Cir. 2014) ..........................................................17

*Hanlon v. Chrysler Corp.*
      150 F.3d 1011 (9th Cir. 1998)...............................................13, 14, 15, 16

*In re ConAgra Foods, Inc.*
      90 F. Supp. 3d 919 (C.D. Cal. 2015).........................................................16

*In re Hyundai and Kia Fuel Economy Litigation*
      881 F.3d 679 (9th Cir. 2018).....................................................................21

*In re School Asbestos Litig.*
      789 F.2d 996 (3d. Cir. 1986).....................................................................22

*In re Tobacco II*
      46 Cal. 4th 298 (2009).........................................................................16, 17

*Johns v. Bayer Corp.*
    280 F.R.D. 551 (S.D. Cal. 2012).................................................................14

*Kwikset Corp. v. Super. Ct.*
    51 Cal. 4th 310 (2011).................................................................13, 16, 17

*Lanoka v. Twinning's N. Am., Inc.*
    2014 WL 1652338 (N.D. Cal. Apr. 24, 2014) ..........................................19

*Levya v. Medlie Indus. Inc.*
    716 F.3d 510 (9th Cir. 2013)................................................................20, 21

*Mass Mutual Life Ins. Co. v. Super. Ct.*
    97 Cal. App. 4th 1281 (2002).....................................................................18

*Mazza v. Am. Honda Motor Co.*
    666 F.3d 581 (9th Cir. 2012)..........................................................16, 20, 21

*Mullins v. Direct Digital*, LLC
    2014 Wl 5461903 (N.D. Ill. Sept. 30, 2014)............................................22

*O'Donovan v. CashCall, Inc.*
    278 F.R.D. 479 (N.D. Cal. 2011) ..............................................................16

*Ortega v. Nat. Balance*
    300 F.R.D. 422 (C.D. Cal. 2014) ...................................................14, 18, 22

*Pulaski & Middleman, LLC v. Google*
    802 F.3d 979 (9th Cir. 2015).....................................................................19

*Quesada v. Herb Thyme Farms, Inc.*
    62 Cal. 4th 298, 361 P.3d 868 (2015) .......................................................16

*Reynoso v. S. Cnty. Concepts*
    2007 WL 4592119 (C.D. Cal. Oct. 15, 2017)............................................12

*Schramm v. JPMorgan Chase Bank, N.A.*
    2011 WL 5034663 (C.D. Cal. Oct. 19, 2011)............................................21

MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION

*Stearns v. Ticketmaster Corp.*

    655 F. 3d 1013 (9th Cir. 2011)...................................................................18

*Torres v. Mercer Canyons, Inc.*

    835 F.3d 1125 (9th Cir. 2016)...................................................................12

*Vaccarino v. Midland Nat. Life Ins. Co.*

    2014 WL 572365 (C.D. Cal. Feb. 3, 2014)................................................19

*Werdebaugh v. Blue Diamond Growers*

    2014 WL 2191901 (N.D. Cal. May 23, 2014) ...........................................13

*Wiener v. Dannon Co.*

    255 F.R.D. 658 (C.D. Cal. 2009) ........................................................14, 15

**<u>RULES</u>**

Fed. R. Civ. P. 23 ...............................................................................................1, 8

Fed. R. Civ. P. 23(a) ............................................................................................12

Fed. R. Civ. P. 23(a)(1).........................................................................................12

Fed. R. Civ. P. 23(a)(2).........................................................................................12

Fed. R. Civ. P. 23(a)(3).........................................................................................13

Fed. R. Civ. P. 23(a)(4).........................................................................................14

Fed. R. Civ. P. 23(b)(3).................................................................................11, 14, 15

MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION

Pursuant to Rule 23, Plaintiff Rosa Alvarez moves this Court to certify the following Classes: 1) a 10-State Class with laws similar to California's UCL or a California-Only UCL Class; and 2) a California-Only CLRA Class. Plaintiff also seeks appointment as the Class representative, and appointment of Bonnett, Fairbourn, Friedman & Balint, P.C., and Siprut, PC, as Class Counsel.

## I.    COMMON EVIDENCE WILL BE USED TO PROVE THE CLASSES' CLAIMS

### A.    All Products Have the Same Active Ingredient and Their Labels Make the Same Common False and Misleading Representations

Throughout the applicable Class periods, Defendants sold 5 Biotin Products to consumers in the Multi-State Class states. (Ex. A (NB_ALVAREZ001090) (spreadsheets evidencing Defendants' sale of the Products in the Class States from March 22, 2013 to July 19, 2018)).

The single ingredient Products contain the same purported active ingredient – biotin. (Ex. B, Defendants' Responses to Requests for Admission ("RFA"), Nos. 1 and 2). Their labels make the same affirmative hair, skin, and nails support representations and two Products also make an energy support representation (collectively, the "benefit representations"). No other benefits are identified. (Ex. C, Product Labels (D.E. 38-1); *see also* Ex. A, Response to RFA, No. 4 (Product labels uniform nationwide)).

All consumers were exposed to Defendants' deceptive benefit representations at the point of purchase. (Ex. D, Answer to SAC, ¶ 20 (D.E. 41) ("Defendants admit that consumers who purchase the Biotin Products are likely exposed to the labels")). Receipt of these purported benefits was the only reason to buy the Products and Defendants have presented no credible evidence otherwise. (Ex. E, Deposition of Christopher M. O'Connor ("O'Connor Dep."), at 125:23-126:9).

### B. Common Evidence Will Be Used to Demonstrate that the Products Do Not Provide Any of the Represented Benefits

#### 1. The IOM in 1998 and in 2006, and the FDA in 2016, set the Daily Recommended Intake (AI) of biotin at 30 mcg per day.

Prior to 1998, the AI (adequate intake)/Daily Recommended Intake (DRI) for biotin was set at 300 mcg per day. In 1998, the IOM reduced the AI from 300 mcg to 30 mcg, reflecting a trend over the last few decades of lowering the daily requirement as more is learned about biotin needs and its sources. (Ex. F, Expert Rebuttal Report of Barry Wolf, M.D., Ph.D. ("Wolf Reb. Rpt."), at ¶¶ 12-13 and 115-117). And while a RDA (recommended dietary allowance) has not been set because measurement of biotin status in the human body and its sources have not yet been refined enough (*id.* at ¶ 122), per the IOM the AI of 30 mcg per day for adults represents an overestimate of what might eventually be the RDA. (*Id.* at ¶¶ 6, 119). This AI was republished and reconfirmed by the IOM in 2006 and in 2016 the FDA, consistent with other daily requirements setting authorities, reduced its AI from 300 mcg to 30 mcg for adults and 35 mcg for pregnant and lactating women (the extra 5 mcg amount being easily obtained from dietary sources). (*Id.* at ¶¶ 6, 12, 105, 115-117). The IOM's AI represented a consensus of experts in the field as to the amount needed for the general population to maintain healthy levels of biotin and in 2016 the FDA reconfirmed that this AI still represented the most current science and a consensus amongst experts in the field. (*Id.* at ¶ 12).

The FDA's increase to 35 mcg per day for pregnant women over the IOM's 30 mcg recommendation was in response to the 30 years of research by Defendant's expert, Dr. Donald Mock, who early on claimed that pregnant women were "marginally biotin deficient" and that this posed a risk of birth defects. (*Id.* at ¶¶ 4-6). But Dr. Mock has admitted in his most recent publications that marginal deficiency in pregnancy has not been established and that he does not recommend

wholesale biotin supplementation in pregnant women. (*Id.* at ¶¶ 43, 50; Ex. G, Deposition of Donald Mock, M.D., Ph.D. ("Mock Dep."), at 138:1-7).

In fact, Dr. Mock's testimony and opinions actually support Plaintiff's claims, as not once does he opine that Defendants' mega-dose Biotin Products are needed by the general population to correct marginal deficiency (he never discusses Defendants' mega-dose Biotin Products as being needed other than for three rare genetic disorders).[1]

Moreover, Plaintiff's expert, Dr. Barry Wolf MD PhD, one of the world's most renown biotin researchers and experts, notes that no such "marginal deficiency" has ever been established despite 30 years of intensive research by Dr. Mock and his colleagues, and if such "marginal deficiency" does exist it can easily be corrected by small dietary changes to satisfy the 5 mcg additional biotin that hypothetically may be needed by pregnant women, who should not take supplemental biotin at all, let alone 5000-10,000 mcg on a daily basis. (Ex. F, Wolf Reb. Rpt. at ¶¶ 6, 59-60, 65, 94, 96, 114).

Dr. Wolf, who discovered one of the three rare genetic conditions that require pharmacological doses of biotin, has opined that for the general population (other than the approximate 0.00138 percent of the population that have one of these rare genetic conditions), any biotin supplementation, let alone supplementation in pharmacological doses of 5000 mcg and up, is superfluous and unneeded and, in fact, poses a risk of serious harm and possible death.

---

[1] In his report and rebuttal report, Dr. Mock claims that 2-3 times the AI of 30 mcg might be needed to correct marginal deficiency during pregnancy (Ex. H, Expert Report of Donald M. Mock, M.D., Ph.D. ("Mock Rpt."), at ¶ 117). Even though he upped this to 90-100 mcg additional biotin during his deposition, these increased amounts are 16-32 times less than that in Defendants' mega-dose Biotin Products.

MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION

### 2. The science demonstrates that mega-dose biotin supplements are superfluous, unneeded, and pose a risk of harm.

Dr. Wolf notes that, "because of the metabolic characteristics of biotin, its availability from most food sources, and the finite needs of the human body [carboxylases] for biotin," … "Defendants' biotin products do not provide any benefits to the general population and, thus, they do not help support healthy hair, skin and nails, or energy or energy production." (Ex. I, Expert Report of Dr. Barry Wolf, M.D., Ph.D. ("Wolf Rpt."), at ¶¶ 11, 12).

Dr. Mock does not dispute Dr. Wolf's opinion that the needs of the carboxylases are finite and instead hypothesizes (1) that there may be other uses of biotin such as its possible effect on gene expression, or (2) that some people may be marginally biotin deficient and thus their carboxylases are not saturated. (*See generally* Exs. H (Mock Rpt.) and J, Rebuttal Expert Report of Donald M. Mock, M.D., Ph.D. ("Mock Reb. Rpt.")). In addition to biotin's effect on gene expression being an unproven hypothesis, Dr. Wolf points out that even if biotin may be found to affect other biochemical functions, the AI is an overestimate of our biotin needs, we get anywhere from 35-70 mcg of biotin from our diet and other than those with the rare genetic disorder, biotinidase deficiency, everyone else actually recycles biotin, such that there is no need for supplemental biotin. (*See, e.g.*, Ex. I, Wolf Rpt. ¶ 18, 30, 32; Ex. F, Wolf Reb. Rpt. ¶¶ 6-7, 34, 119).[2]

And, no one has proven that marginal deficiency exists in the general population. (Ex. F, Wolf Reb. Rpt. at ¶ 3; Ex. L, Deposition of Barry Wolf, M.D., Ph.D. ("Wolf Dep."), at 40:12-20, 46:12-48:3). Pregnant women are no exception. At best, after 30 years of intensive research on this question, the most Dr. Mock and others can show is that there is some increase in a few biomarkers possibly

---

[2] Mark Gelbert, PhD, Defendant Nature's Bounty Co.'s Chief Scientific Officer, and Defendants' 30(b)(6) science designee, acknowledged the IOM has set the Adequate Intake ("AI") for biotin at 30 mcg per day for adults, had no answer as to whether Defendants disputed the designed AI, and did not know whether the recommended amount could be easily consumed as part of a balanced diet. (Ex. K, Deposition of Mark Gelbert, PhD ("Gelbert Dep."), at 186:14-187:7, 205:5-25).

related to a small biotin deficiency in pregnant women. But Dr. Wolf notes that this does not establish that pregnant women are biotin deficient as the presence of these biomarkers has several other explanations. (Ex. F, Wolf Reb. Rpt. ¶¶ 4, 48-52, 105-107; Ex. L, Wolf Dep. at 46:1-48:14). Dr. Wolf further notes:

> If any such marginally-deficient states are identified and there is a subsequent correlation between these states and an adverse health result, then possibly up to 35 mcg of biotin might be appropriate for these individuals. However, none has been identified to date. Thus, at best Dr. Mock's report is focused upon the possible need for biotin supplementation in the range of 35 mcg, not 5,000 or 10,000 mcg.

(Ex. F, Wolf Reb. Rpt. at ¶¶ 9-10).

Even Dr. Mock has admitted that the increases/changes in biotin biomarkers during pregnancy may have nothing to do with any purported marginal biotin deficiency and may just be due to the enormous biochemistry changes that occur during pregnancy. (Ex. F, Wolf Reb. Rpt. at ¶¶ 4, 102-103 (citing Mock, D. M. Marginal biotin deficiency is common in normal human pregnancy and is highly teratogenic in mice. *J. Nutr.* **2009,** 139, 154-157)). Not surprisingly, then, Dr. Mock does not recommend that pregnant women take mega-dose biotin supplements.[3]

Dr. Mock and Defendants also cite to some very early and preliminary reports that persons who take anticonvulsants, women smokers, and persons who

---

[3] Dr. Mock could not affirmatively state how much more biotin anyone with this so-called marginal deficiency would have to intake to correct it and could only venture a guess, one that was not in his reports, that pregnant women may need between 90 mcg and 300 mcg. (Ex. G, Mock Dep. at 138:8-21). But, in 2015 he lent his name to a review of biotin for the Linus Pauling Institute that, after discussing the possibility of marginal deficiency, recommended that people should take no more than 30 mcg of supplemental biotin (*See* https://lpi.oregonstate.edu/mic/vitamins/biotin). Dr. Wolf similarly opines that if a marginal deficiency ever is shown to exist and pose health concerns – at most, an additional 5-30 mcg a day would suffice. (Ex. F, Wolf Reb. Rpt. at ¶¶ 9-10).

derive their nutrition solely from an IV (on a long-term basis no less) may also be "marginally deficient." (Ex. H, Mock Rpt. at ¶¶ 120, 122, 149-150; Ex. J, Mock Reb. Rpt. at ¶¶ 3, 14, 36-37). Other than IV patients whose formula did not contain sufficient biotin, and thus were being induced into frank deficiency which was easily corrected early on with physiological doses of biotin being added to the IV solution (Ex. F, Wolf Reb. Rpt. at ¶ 85), the articles cited were decades old and merely posed hypotheses stating that they were too small to reliably reach any conclusions and that larger studies would be required to test the hypotheses. (*Id.* at ¶¶ 110-113; Ex. L, Wolf Dep. at 61:16-62:16; 144:17-145:2). Proof that these hypotheses are still of little concern is that no one has conducted larger studies to see if any purported marginal deficiencies existed in these populations. (*Id.* ).[4]

Dr. Mock's unproved hypotheses aside, the scientifically supported facts are that the only known use of mega-dose biotin supplements is for persons "who have one of three inherited, biotin-dependent or biotin-responsive disorders" (Ex. I, Wolf Rpt. at ¶ 22), which Dr. Wolf estimates to be only 0.00138 percent of the U.S. population,[5] meaning that "more than 99.99 percent of the U.S. population will not benefit from the Defendants' biotin supplements." (*Id.* at ¶ 26). "For all others … Defendants' biotin supplements are useless and superfluous." (*Id.*). Dr. Mock's reports do not rebut these key opinions of Dr. Wolf. Tellingly, Dr. Mock admitted that he could not find any studies addressing whether biotin supplements in any dose – let alone the mega-doses in Defendants' Biotin Products – help support the health of hair, skin, or nails in the general population. (Ex. G, Mock Dep. at 50:21-59:7-16). He also admitted that he had never heard of any such

---

[4] For example, the American Epilepsy Society has no recommendation that persons on anti-convulsants take biotin supplements. *See generally* https://www.aesnet.org/.

[5] There was a typo in Dr. Wolf's initial report which cited the number as 0.000138. This was corrected and counsel for Defendants noted that she understood that this was a typo. (Ex. L, Wolf Dep. at 113:25-114:8).

MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION

studies ever being conducted, despite being involved in biotin research for over three decades. (*Id.*). The absence of such studies is readily explained by Dr. Wolf – researchers put their research efforts toward matters that are of interest (Ex. F, Wolf Reb. Rpt. at ¶ 50), and because we ingest far more biotin than we need there was no reason to study any purported benefits of supplemental biotin as there are none.

When his unproven hypotheses are cast aside, all that remains is Dr. Mock's opinion that a molecule of biotin derived from Defendants' supplements is the same as a molecule of biotin derived from the diet and that biotin is an essential vitamin that supports key functions relating to, among other things, the health of hair, skin, and nails. (Ex. I, Wolf Rpt. at ¶ 15; Ex. F, Wolf Reb. Rpt. at ¶¶ 7-8). But these facts do not address the key issue – whether consumers obtain sufficient biotin from their daily diet such that Defendants' Products are superfluous and thus, Dr. Mock does not attempt to rebut the opinions of Dr. Wolf on this critical point. (*E.g.*, Ex. I, Wolf Rpt. ¶¶ 13, 18; Ex. F, Wolf Reb. Rpt. ¶¶ 122).

Because Defendants' Products are superfluous, Class members have lost money and are endangering their health by taking the mega-dose biotin. In November 2017, the FDA issued the following alert: "The FDA is alerting the public, health care providers, lab personnel, and lab test developers that biotin can significantly interfere with certain lab tests and cause incorrect test results which may go undetected …. [that pose] potentially serious clinical implications." (Ex. F, Wolf Reb. Rpt. at ¶ 12 (citing U.S. Food & Drug Admin., "The FDA Warns that Biotin May Interfere with Lab Tests: FDA Safety Communication", *available at* https://www.fda.gov/medicaldevices/safety/alertsandnotices/ucm586505.htm ("FDA Warning"))). The FDA singled out biotin supplements sold for beauty purposes, like Defendants' Products, because they contain substantial multiples of the recommended daily intake of biotin and, "[s]ince patients are unaware of biotin

interference, patients may not report taking biotin supplements to their physicians, and may even be unaware they are taking biotin (e.g., when taking products generally labeled for their benefits to hair and nails)." (FDA Warning). The FDA warned consumers, "[k]now that biotin is found in multivitamins, including prenatal multivitamins,[6] biotin supplements, and supplements for hair, skin, and nail growth in levels that may interfere with laboratory tests." *Id.*

While Plaintiff believes that, on this record, summary judgment in favor of Plaintiff and the Class will ultimately be warranted, at the class certification stage the issue is not whether Defendants' benefit representations are in fact false or misleading, but whether Plaintiff's claims are amenable to classwide treatment because there is a common predominant issue of fact or law. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. . . .") (citation and quotation marks omitted). There are, as at best, Defendants' expert's reports and opinions actually establish that there are common and predominant questions here – are Defendants' mega-dose Biotin Products superfluous and unneeded in the general population?

## C. The Products are Worthless, Entitling Plaintiff and the Classes to a Full Refund Calculable on a Classwide Basis

If, as Plaintiff contends and as the record now reflects, the Products do not provide the represented benefits to the general populace, the monetary loss to each Class member is identical – the entire purchase price paid. Using Defendants' state-by-state wholesale sales data (adjusted for discounts and returns) and Nielsen

---

[6] Multivitamins contain far lower levels of biotin – 30-100 mcg (50 to 100 times less than Defendants' biotin supplements) (Ex. F, Wolf Reb. Rpt. at ¶¶ 5, 108) – yet they too pose a risk.

retail sales data[7], classwide damages can be calculated on a common basis using either a wholesale or retail price-based formula:

**Defendants' quantity shipped x Defendants' average wholesale price**

or

**Defendants' quantity shipped x Nielsen average retail price.**

(Ex. M, Rebuttal Expert Report of Joseph J. Egan ("Egan Rpt."), at 11, 14).  As the first formula is wholesale price based, it yields a conservative estimate of the amounts Class members would have paid.  (*Id.* at 13; Ex. N, Deposition of Jesse David, Ph.D. ("David Dep.") at 74:20-75:2 (wholesale prices are generally lower than retail prices)).

If Defendants prove that individuals with the rare biotin-responsive disorders that require mega-dose biotin treatments have purchased their Products – an uphill battle as Defendants affirmatively represent that the Products are not intended to treat or cure any diseases, market the Products solely as "Beauty Aids", and the unrefuted evidence establishes that such persons comprise less than 1% of the U.S. population – the aggregate damages calculation may arithmetically be reduced by 1% to account for any such purchases.  (Ex. M, Egan Rpt. at 16).

Similarly, if Defendants convince the fact finder that marginal biotin deficiency exists AND that it causes health consequences AND some biotin supplementation is needed, then the aggregate damage amount can be arithmetically reduced by the proportionate amount the suggested dose bears in relation to the 5000 mcg and 10,000 mcg mega-dose Products – be it 5 mcg, 30

---

[7] Nielsen provides Defendants with market sales and consumption data such as sales dollars, sales units, retailer prices, and total number of sales by retailer.  (Ex. E, O'Connor Dep. at 126:10-128:2; 133:24-134:14.)  The data is updated every four weeks (*id.* at 135:15-20), can be compiled so that it is specific to the Biotin Products (*id.* at 129:7-13), and Defendants have access to the data going back two and a half to three years (*id.* at 140:4-9).

1    mcg, 100 mcg, or the highest amount that Dr. Mock claims is needed for pregnant

2    mothers, 300 mcg.

3        Joseph Egan, PE, CFE, has estimated Classwide damages under both

4    formulas for the Multi-State and California-Only Classes from March 22, 2013

5    through July 19, 2018. (Ex. M, Egan Rpt. at 11-12, 14-16, and Attachments 1-2).

6    While Defendants' damages expert disagrees that Class members are entitled to a

7    full refund, he acknowledges that his alternative measure(s) of damages are based

8    on a "hypothetical," "but-for" world and not what he characterizes as the "actual

9    world" upon which full refund damages are based. (Ex. N, David Dep. at 78:10-

10   18).  In deposition, Defendants' expert admitted that his hypothetical damages

11   opinions assume the Products can either be re-labeled or reformulated to

12   accurately state their benefits if the benefit representations are proven false.  (*See*

13   *id.* at 116:24-118:12).  They cannot be.  They cannot be reformulated as the

14   unrefuted evidence is that biotin is the only active ingredient in the Products and

15   mega-dose biotin is superfluous, unneeded, and poses a risk of harm.  They also

16   cannot be relabeled as, at most, less than 1% of the U.S. population with biotin-

17   responsive disorders may benefit from the mega-doses of biotin in the Products

18   but dietary supplement manufacturers cannot market their products as treating or

19   curing diseases or illnesses.  Thus, by his own admission, Defendants' expert's

20   hypothetical damages opinions do not and cannot apply to this case – not to

21   mention they are based upon facts not in evidence.  Further undermining his

22   criticisms of Plaintiff's full refund damages calculations is that Defendants' expert

23   admits that he has ***never*** estimated damages in the many cases in which he has

24   submitted damages reports or testified, he has not done so here, and he does not

25   know if he can.  (*Id.* at 57:24-58:10, 69:8-71:15, 89:8-20, 91:3-16, 121:1-122:10).

26   //

27   //

28

## II.    LEGAL ARGUMENT

### A.    Class Certification Should Be Granted

False advertising cases based on uniform misrepresentations are routinely certified, particularly where individual damages are small.  *See*, *e.g.*, *Forcellati v. Hyland's, Inc.,* 2014 WL 1410264, at *8, n. 5 (C.D. Cal. Apr. 9, 2014) (collecting cases).

Any doubts should be resolved in favor of certification because "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (emphasis original).

### B.    Plaintiff's Proposed Classes

Plaintiff seeks certification of the following Rule 23(b)(3) Classes:

**Multi-State UCL Class:**
All consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased Biotin Products in California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington.

OR

**California-Only UCL Class:**
All California consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased Biotin Products.

AND

**California-Only CLRA Class:**
All California consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased Biotin Products.

Excluded from all Classes are Defendants and their officers, directors, and employees, and those persons who purchased the Products for the purpose of resale.

As defined, the Classes include the less than 1% of consumers with inherited biotin disorders who may benefit from supplemental biotin.  There is no evidence

that any of these persons purchased the Biotin Products. But even if some of them did, the inclusion of uninjured Class members – particularly where their numbers are negligible as they are here – does not defeat certification. *See, e.g.*, *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016) ("[F]ortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the definition.").

### C.    Plaintiff Satisfies the Rule 23(a) Prerequisites

#### 1.    Rule 23(a)(1) – The proposed Classes are numerous.

Numerosity is satisfied as Defendants admit that they sold the Products to tens of thousands of consumers in California and the United States, and their joinder is impracticable. (D.E. 41, Answer to SAC, ¶¶ 1, 16, 24). *See, e.g.*, *Reynoso v. S. Cnty. Concepts*, 2007 WL 4592119, at *2 (C.D. Cal. Oct. 15, 2017).

#### 2.    Rule 23(a)(2) – Issues are common.

Here, as in *Forcellati*, 2014 WL 1410264, at *9, "'[b]ecause a determination of the truth or falsity of Defendant[s'] representation of [the products'] efficacy will resolve an issue that is central to the validity of each one of the claims in one stroke,' and the products' efficacy can be established on a class-wide basis through …expert testimony, Plaintiffs have sufficiently shown commonality" (quoting *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 589 (C.D. Cal. 2011). *See also Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857 at *5 (C.D. Cal. July 1, 2013) (commonality satisfied where plaintiff's claims arise from uniform product labels); Ex. O, *Barrera v. Pharmavite LLC,* C.D. Cal. No. 2:11-cv-04153-CAS-AGRx, D.E. 192 (slip op.), at 17 ("Because the [products'] packaging conveyed a uniform message, plaintiff's common questions can be resolved 'in one stroke'").

1   Materiality is also a common issue because whether a representation is

2   "materially misleading" ..."focuses on *the [d]efendants'* representations about the

3   product" which were uniform and commonly viewed by all Class members. *Bruno*

4   *v. Quten Research Inst., LLC*, 280 F.R.D. 524, 537 (C.D. Cal. 2011) (collecting

5   cases) (emphasis added); *see also* Ex. P, *Korolshteyn v. Costco Wholesale Corp,*

6   *et al.*, S.D. Cal. No. 3:15-cv-709-CAB-RBB, D.E. 158, Order Granting Motion for

7   Class Certification, at 10 ("*Korolshteyn*") (Mar. 16, 2017) ("Likewise, the

8   determination of whether the statements on the label are material and likely to

9   deceive a reasonable consumer will be the same for the entire class.").

10              **3.  Rule 23(a)(3) – Plaintiff's claims are typical.**

11   Typicality is met as the claims asserted on behalf of Plaintiff and the

12   proposed Classes are the same and are based on the same false and misleading

13   hair, skin, nail, and energy representations prominently featured on the Product

14   packages.   *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998)

15   (Typicality satisfied where named plaintiff's and Class members' claims are

16   "reasonably co-extensive").

17   Typicality does not require that the claims be "substantially identical," nor

18   that the deceptive message be the sole reason for purchase. *See, e.g.*, *Hanlon*, 150

19   F.3d at 1020; *Werdebaugh v. Blue Diamond Growers,* 2014 WL 2191901, at *14

20   (N.D. Cal. May 23, 2014), *decertified on other grounds,* 2014 WL 7148923 (N.D.

21   Cal. Dec. 15, 2014).

22   Further, whether the misrepresentation "may not have had the 'same impact

23   on all consumers' and may not have informed an individual's buying decision is

24   not relevant, because the standard is an objective one". *Guido v. L'Oreal, USA,*

25   *Inc.*, 284 F.R.D. 468, 475, n. 6 (C.D. Cal. 2012).  And, "individual experience with

26   a product is irrelevant" as the injury occurs at the moment-of-purchase. *Kwikset*

27   *Corp. v. Super. Ct.,* 51 Cal. 4th 310, 334 (2011) ("a buyer forced to pay more than

28

he or she would have is harmed at the moment of purchase"); *Ortega v. Nat. Balance*, 300 F.R.D. 422, 426 (C.D. Cal. 2014); *Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012).

### 4. Rule 23(a)(4) – Plaintiff and her counsel have and will continue to adequately represent the Classes.

Plaintiff is an adequate representative because her and Class members' interests do not conflict, and she will "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F. 3d at 1020; *see also Wiener v. Dannon Co.*, 255 F.R.D. 658, 667 (C.D. Cal. 2009).

Plaintiff seeks relief that will benefit all Class members. Strongly wedded to the belief that it is important "just to not deceive the consumers" and that "we should probably do something about not putting [the false representations] on the label" (Ex. Q, Deposition of Rosa Alvarez ("Alvarez Dep."), at 157:1-8), Plaintiff brought this lawsuit, participated in discovery, sat for deposition, demonstrated she is aware of and will readily accept the responsibilities of Class representative, is informed about the claims in this action and the relief she is requesting, and remains committed to diligently litigating this case. (*Id.* at 16:14-22; 144:1-10; 151:21-152:23; 154:17-22; 156:16-157:8). Plaintiff also retained counsel with significant experience in prosecuting class actions, including false advertising cases. (Ex. R (firm resumes)). Thus, Plaintiff and her counsel meet the adequacy requirement. *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 566-67 (S.D. Cal. 2012) (adequacy is met when plaintiff and the proposed class share the same claims and interest in obtaining relief, and plaintiff is vigorously pursuing relief on behalf of the proposed class).

### D.    Rule 23(b)(3) is Satisfied

A class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available

14

methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) encompasses cases "in which a class action would achieve economies of time, effort, and expense, and promote. . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods. v. Windsor, Inc.,* 521 U.S. 591, 615 (1997); *Wiener*, 255 F.R.D. at 668.

### 1. Predominance is satisfied.
#### a. Common issues predominate.

Rule 23(b)(3) demands only predominance of common questions, not exclusivity or unanimity of them. *Hanlon*, 150 F.3d at 1022 (citation omitted). As such, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper . . . even though other matters will have to be tried separately." *Gartin v. S & M Nutec, LLC*, 245 F.R.D. 429, 435 (C.D. Cal. 2007) (internal citation omitted; alteration in original); *see also Wiener*, 255 F.R.D. at 668.

The Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging consumer … fraud." *Amchem Prods.,*, 521 U.S. at 625. "Courts in California 'routinely find that this inquiry focuses on the Defendants' representations about the product. . ..'" Ex. S, *Neal v. NaturalCare, Inc.,* EDCV 12-00531 DOC (OPx), Order Granting Class Certification, at 15 (E.D. Cal. Dec. 20, 2012) (predominance satisfied where "central predominating question is whether Defendants' label and marketing statements are materially misleading"), *decertified on other grounds*, 2014 WL 346639 (C.D. Cal. Jan. 30, 2014).

Whether Defendants misrepresented the Products' benefits predominates over any potential individual questions. It is *the* most significant aspect of this case and "can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. If each Class member were to pursue their claim individually, the evidence of falsity would be identical in each case. *See*

*O'Donovan v. CashCall, Inc.*, 278 F.R.D. 479, 493 (N.D. Cal. 2011) (finding predominance as common questions can be proven with "generalized evidence…on a class-wide basis").

Materiality is also a significant predominating question as classwide reliance may be inferred under the CLRA[8] if the objective "reasonable person" would find the benefit representations to be material. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 983 (C.D. Cal. 2015). The Product labels are material on their face and all Class members were exposed to these front label representations at the point of purchase. As the court in *Kwikset* found: "Simply stated: labels matter. The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label." 51 Cal. 4th at 328. More recently, the California Supreme Court recognized the same:

> To buyers and sellers alike, "labels matter." They serve as markers for a host of tangible and intangible qualities consumers may come to associate with a particular source or method of production. Misrepresentations in labeling undermine this signifying function, preventing consumers from correctly identifying the goods and services that carry the attributes they desire while also hampering honest producers' attempts to differentiate their merchandise from the competition.

*Quesada v. Herb Thyme Farms, Inc.*, 62 Cal. 4th 298, 302-03, 361 P.3d 868, 870 (2015) (quoting *Kwikset*, 51 Cal.4th 310, 328). Labeling assumes even more importance "when a customer makes a decision to purchase a health product that he or she will ingest for purported health benefits, [as] any claim on the label regarding the health benefits (i.e., any product efficacy claims) or any claims

---

[8] Classwide reliance is not required under the UCL as all that is required is that the named Plaintiff testify to her reliance. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012) ("Under California's UCL, restitution is available to absent class members without proof of deception, reliance, or injury" (citing *In re Tobacco II*).) The only relevant reliance inquiry in a UCL case is whether the class representative relied. *In re Tobacco II*, 46 Cal. 4th at 312.

1   regarding the safety of the product can be presumed material." *FTC v. Nat'l*
2   *Urological Grp., Inc.*, 645 F. Supp.2d 1167, 1191 (N.D. Ga. 2008). Further, the
3   benefit misrepresentations were the only purported Product benefits, Defendants
4   provided no other reason for consumers to purchase the Products, and materiality
5   requires only that the benefit representations be a "substantial factor" – not the sole
6   or predominant reason – for purchase. *See In re Tobacco II*, 46 Cal. 4th at 326–
7   27 (misrepresentations need only be a substantial factor motivating the purchase);
8   *see also Forcellati*, 2014 WL 1410264, at *11 (same); *Kwikset*, 51 Cal. 4th at 327
9   (same).

**b. Reliance and causation issues do not defeat predominance.**

11  To establish a UCL class claim, one need only show the Plaintiff's actual
12  reliance. *In re Tobacco II*, 46 Cal. 4th at 312. Plaintiff testified that she read and
13  relied on the label representations in making her purchase decision. (Ex. Q,
14  Alvarez Dep. at 105:21-106:5 (representations on the front of the package
15  "prompted [Plaintiff] to buy the product.")).

16  No proof of Class members' individual reliance, deception, or injury is
17  required. *Abbit v. ING USA Annuity*, 2015 WL 7272220, at *10 (S.D. Cal. Nov.
18  16, 2015). And here, no proof of classwide reliance is required as the
19  misrepresentations are uniform and all Class members were "exposed" to them.
20  *See Gutierrez v. Wells Fargo Bank NA*, 589 Fed. Appx. 824, 827 (9th Cir. 2014)
21  (rejecting defendant's argument that district court was not "empowered" to award
22  class-wide restitution under the UCL because class-wide reliance had not been
23  established finding "the record is replete with examples of [the defendant's] false
24  and misleading statements" (citing *In re Tobacco II*)); *see also Circle Click Media*
25  *LLC v. Regus Mgmt. Grp. LLC*, 2015 WL 6638929, at *13 (N.D. Cal. Oct. 29,
26  2015) (same).

27  Although the CLRA requires classwide reliance: "If the trial court finds that

28

material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." *Stearns v. Ticketmaster Corp.*, 655 F. 3d 1013, 1022 (9th Cir. 2011), *abrogated on other grounds*, 133 S.Ct. 1426 (2013) (emphasis in original; internal citations and quotation marks omitted). As the court in *Mass Mutual Life Ins. Co. v. Super. Ct.* explained:

> Causation as to each class member is commonly proved more likely than not by materiality. That showing will undoubtedly be conclusive as to most of the class. The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all.

97 Cal. App. 4th 1281, 1292 (2002). *See also Guido*, 284 F.R.D. at 482 (citing *Mass. Mutual*, 97 Cal. App. 4th at 1292).

For the reasons set forth in Section III D(1)(a) above, including that the benefit misrepresentations were the only stated Product benefits, the benefit representations are material. *See also F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) ("Express product claims are presumed to be material. . . ." ); *Ortega*, 300 F.R.D. at 429 ("It strains credulity to think that a merchant would select exclusively immaterial statements to print on its product's packaging."), *decertified on other grounds*, 2015 WL 12655388 (C.D. Cal. Feb. 20, 2015); *Negrete*, 287 F.R.D. 590 at 612 ("[c]onsumers are nearly certain to rely on prominent (and prominently marketed) features of a product which they purchase, particularly where there are not otherwise compelling reasons for purchasing a product that is allegedly worth less than the purchase price.") (citations omitted).

Thus, reliance and causation issues do not defeat predominance.

### c. Damages can be calculated on a Classwide basis.

Aggregate damages based upon a full Product retail price refund for all Class members complies with *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), because it is directly "tied" to Plaintiff's theory of the case: that the

18

Products are worthless. *Id.*; *see also Allen v. Hyland's, Inc.,* 300 F.R.D. 643, 671 (C.D. Cal. 2014) ("Plaintiffs' theory is that the products are *entirely* ineffective" and, thus, "Plaintiffs' damages theory – predicated on the notion that class members are entitled to full restitution for products with no value – is consistent with Plaintiffs' liability theory") (emphasis original); *Lanoka v. Twinning's N. Am., Inc.*, 2014 WL 1652338, at *6 (N.D. Cal. Apr. 24, 2014) (purchasers should be compensated "for the difference between a product as labeled and the product as received.").

If Defendants prove that persons with the rare genetic disorders are Class members or the Court presumes that some are, as they represent, at most, 0.00138 percent of the U.S. population, the aggregate damages amount either can be reduced by this relative percentage or the amount deemed so de minimis as to not warrant any such deduction. The law is well-settled that the full refund amount due Plaintiff and Class members need not be precisely determined, nor account for all variables, as an approximation suffices. *Vaccarino v. Midland Nat. Life Ins. Co.,* 2014 WL 572365, at *11-13, n.8 (C.D. Cal. Feb. 3, 2014) (resolution of legal and factual issues following certification "will necessarily imply further adjustments and modification of any damages model and "courts determine whether damages are susceptible of classwide measurement, not whether that measurement is precisely correct."); *see also Pulaski & Middleman, LLC v. Google*, 802 F.3d 979, 989 (9th Cir. 2015) (same). Similarly, if the fact finder determines that marginal deficiency exists and requires some supplementation (record range is between 0-300 mcg), aggregate damages can be reduced by the proportionate value of this amount in relation to the total dosage. In short, any adjustments deemed necessary if the fact finder determines that the Classes include consumers with biotin responsive disorders or who are marginally biotin deficient are readily doable as demonstrated in Mr. Egan's Report. (Ex. M, at 16-18).

Moreover, "[d]amage calculations alone cannot defeat certification." *Levya v. Medlie Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013); *see also Blackie v. Barack*, 524 F.2d 891, 905 (9th Cir. 1975). As demonstrated above and in Mr. Egan's Report, Defendants' and Nielsen sales data enable Plaintiff to calculate classwide damages and Mr. Egan has done so. (*See generally*, Ex. M). The court in *Barrera* approved the use of similar retail pricing information to calculate full refund damages. Ex. O, *Barrera* (slip op.) at 33-37 (Nov. 19, 2014); *see also* Ex. P, *Korolshteyn* at 10-12; Ex. T, *Lewert v. Boiron, Inc., et al.*, C.D. Cal. No. 2:11-cv-10803-SVW-SH, D.E. 217, Order Granting in Part Plaintiff's Motion for Class Certification, at 12 (Nov. 5, 2014). And the same damages methodology should be approved here too.

### d. Choice of law issues do not defeat certification of a Multi-State UCL Class.

The consumer fraud laws of the Multi-State Class are materially identical to the UCL based on the particular facts and circumstances of this case. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 590 (9th Cir. 2012) (conflict analysis specific to circumstances of instant case); *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 547 (C.D. Cal. 2012) (same). All provide for private rights of action, all recognize that material misrepresentations satisfy causation, none require actual reliance,[9] and none require knowledge or scienter. (*See* Ex. U(1)-U(3) (analyses of 10 Class states' laws)). The differences are few and manageable. While 2 states require Defendants intended consumers to rely upon the benefit representations, this is self-evident as the benefit representations were prominently featured on the Product labels and were the sole represented Product benefits. Washington and Minnesota also require a "public interest" showing. (*See* Ex. U(2)-U(3), State Law Chart). This, too, is readily determinable as it is satisfied where, as here,

---

[9] As discussed above, California's UCL requires reliance by the named Plaintiff only.

1    Defendants' alleged misrepresentations both preceded and succeeded Plaintiff's

2    purchase and affected many consumers as part of Defendants' general business

3    practices. (*See id.*)  Also manageable are non-outcome determinative differences

4    in statutes of limitations and available damages among the 10 states which may be

5    accounted for by appropriate arithmetic calculations. *See, e.g.*, *Forcellati v.*

6    *Hyland's, Inc.,* 2012 WL 2513481, at *2 (C.D. Cal. June 1, 2012); *Schramm v.*

7    *JPMorgan Chase Bank, N.A.,* 2011 WL 5034663, at *11-12 (C.D. Cal. Oct. 19,

8    2011) (possible differences in statutes of limitations does not preclude class

9    certification); *Levya,* 716 F.3d at 513; *Blackie,* 524 F.2d at 905 (differences in

10   damages do not defeat certification).

11        As such, if Defendants are found to have violated the UCL, they necessarily

12   will have violated the analogous consumer fraud laws in the other 9 states making

13   for a manageable Multi-State Class.

14        As the separately appended state-specific choice of law chart setting forth

15   the elements of the applicable consumer fraud laws with supporting pin point,

16   bookmarked case law citations for ready confirmation makes clear, this case is not

17   like *Mazza* or *In re Hyundai and Kia Fuel Economy Litigation*, where plaintiffs

18   failed to demonstrate "through evidentiary proof that the laws of the affected states

19   do not vary in material ways that preclude a finding that common legal issues

20   predominate." *In re Hyundai*, 881 F.3d 679, 692 (9th Cir. 2018), *rehearing en*

21   *banc granted by* 897 F.3d 1003 (9th Cir. 2018); *see also Mazza*, 666 F.3d at 590-

22   91.

23        The small and manageable number of states, the demonstrated similarity of

24   laws, and the well-settled nature of each state's consumer fraud law make for a

25   clear roadmap for the Court and a manageable Multi-State Class. *See In re School*

26   *Asbestos Litig.*, 789 F.2d 996, 101, n. 11 (3d. Cir. 1986) (degree to which law is

27   clear, as opposed to unsettled, makes for a more manageable class).  Indeed, in

28

*Mullins v. Direct Digital*, LLC, 2014 Wl 5461903 (N.D. Ill. Sept. 30, 2014), this very same multi-state class was certified and affirmed by the Seventh Circuit in No. 15-1776, 795 F.3d 654 (7th Cir. 2015), without discussion, in the face of arguments against the certification of a multi-state class.

### 2. A class action is the superior method of adjudication.

A class action is not only the superior method of adjudication, it is the only feasible method of adjudication given that the amount in controversy is approximately $5-15 per purchase. As the Seventh Circuit noted: "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie*, 376 F.3d at 661 (emphasis original). *See also Ortega,* 300 F.R.D. at 430 (finding superiority met in certifying a class of $16-17 dietary supplement purchasers).

## III.   CONCLUSION

Plaintiff respectfully requests that the Court issue an order granting Plaintiff's Motion for Class Certification and appointing Plaintiff as class representative and the firms of Bonnett, Fairbourn, Friedman & Balint, P.C., and Siprut, PC as Class Counsel.

Dated: October 2, 2018

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.

*/s/Patricia N. Syverson*
Patricia N. Syverson (203111)
Manfred P. Muecke (222893)
600 W. Broadway, Suite 900
San Diego, CA 92101
psyverson@bffb.com
mmuecke@bffb.com
Telephone:  (619) 798-4593

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Elaine A. Ryan *(Admitted Pro Hac Vice)*
Carrie A. Laliberte (*Admitted Pro Hac Vice*)

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
eryan@bffb.com
claliberte@bffb.com
Telephone:  (602) 274-1100

SIPRUT PC
Stewart M. Weltman *(Admitted Pro Hac Vice)*
Michael Chang *(Admitted Pro Hac Vice)*
17 North State Street
Chicago, Illinois 60602
sweltman@siprut.com
mchang@siprut.com
Telephone:  (312) 236-0000

MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION

# **CERTIFICATE OF SERVICE**

I, hereby certify that on October 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic mail notice list.

I certify under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of October 2018.

_/s/ Patricia N. Syverson_
Patricia N. Syverson

MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION