# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSA ALVAREZ, individually and on behalf of herself and all others similarly situated,<br><br>       Plaintiff,<br><br> v.<br><br>NBTY, INC., *et al.*,<br><br>       Defendants. | Case No. 17-cv-00567-BAS-BGS<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**[ECF No. 54]** |

   Presently before the Court is Plaintiff Rosa Alvarez's Motion for Class Certification, ("Mot.," ECF No. 54). Also before the Court is Defendants NBTY, Inc. and Nature's Bounty, Inc.'s opposition to the Motion, ("Opp'n," ECF No. 69) and Plaintiff's reply in support of the Motion, ("Reply," ECF No. 80-1).[1] The Court heard oral argument on the Motion on May 17, 2019. For the foregoing reasons, the Court **DENIES** Plaintiff's Motion.

---

[1] Plaintiff originally filed a reply that exceed the page limits permitted by the local rules. (ECF No. 75.) Defendants moved ex parte to strike the reply, (ECF No. 79) and Plaintiff filed a response attaching a corrected brief that is within the allowable page limits. The Court **GRANTS** Defendants' ex parte motion, (ECF No. 79) and will not consider the original brief, (ECF No. 75) but will instead consider the corrected reply brief, (ECF No. 80-1).

## I. BACKGROUND

Defendants manufacture, market, sell, and distribute biotin supplements under the Nature's Bounty brand. (Second Amended Complaint, "SAC," ECF No. 38, ¶ 1.) The products at issue here are: Biotin 5000 mcg, SUPER POTENCY Biotin 5000 mcg, QUICK DISSOLVE Biotin 5000 mcg, Biotin 10,000 mcg rapid release softgels, and Biotin 10,000 mcg HEALTH & BEAUTY rapid release liquid softgels (hereinafter, "the Products"). (*Id.*) The Products' labels state the Products "Support[] Healthy Hair, Skin, and Nails" and provide "Energy Support." (*See* ECF No. 54-5 (pictures of Product labels).)

In approximately 2014, Plaintiff Rosa Alvarez's hair began falling out. ("Alvarez Depo.," Exhibit B of ECF No. 51-2, at 54:5–12.) Plaintiff went to a dermatologist, who informed her she had alopecia, but told her not to worry and that her hair would grow back. (*Id.* at 55:14–21.) The dermatologist suggested laser treatment, but Plaintiff was not interested. (*Id.* at 60:3–11.) The dermatologist did not recommend any supplements. Also around this time, Plaintiff went to her regular nail salon for a manicure. The nail technician told her there is a supplement on the market that helps with hair and nails. (*Id.* at 66:3–15.) The nail technician took out his bottle of biotin, showed it to Plaintiff and others, and recommended taking the supplement in softgel form. (*Id.* at 68:4–15.) Plaintiff was suffering from hair loss at the time and the thought of "great hair" piqued her interest in biotin. (*Id.* at 69:8–14.) Plaintiff then went to Bed Bath & Beyond and purchased Defendants'10,000 mcg HEALTH & BEAUTY rapid release liquid softgels biotin product. (*Id.*; SAC ¶ 15). She took biotin for a few years, purchasing a new bottle of supplements "religiously" so that she would never run out. (Alvarez Depo. at 20:23–21:1.)

Plaintiff states she purchased the Product "in reliance on Defendants' health benefit representations." (SAC ¶ 15.) She claims the representations are false, misleading, and reasonably likely to deceive the public. In sum, Plaintiff claims Defendants' representations are false because the supplements do not support healthy

hair, skin, and nails.  (*Id.* ¶ 9.)  "The human body only requires a finite amount of biotin on a daily basis for it to perform its enzymatic functions as there are a finite number of enzymes that use biotin. Once there is sufficient biotin in the body, saturation occurs and the body just does not use this surplus biotin." (*Id.* ¶ 3.)  The average person ingests more than enough biotin from his or her normal daily diet. (*Id.*)  "Thus, biotin is not a 'more is better' substance, nor is more biotin needed from supplementation to complete these daily enzymatic functions." (*Id.* ¶ 5.)  "[O]nce one consumes a sufficient amount of biotin, which is easily met by the general population in their everyday diets, the remainder becomes functionally superfluous and does not convey any additional health benefits." (*Id.*)

Plaintiff seeks certification of the following classes:

**Multi-State UCL Class:**
All consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased Biotin Products in California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington.

OR

**California-Only UCL Class:**
All California consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased Biotin Products.

AND

**California-Only CLRA Class:**
All California consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased Biotin Products.

## II. LEGAL STANDARD

Motions for class certification proceed under Rule 23(a) of the Federal Rules of Civil Procedure. Rule 23(a) provides four prerequisites to a class action: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the

claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and (4) the representative parties will fairly and adequately protect the interests of the class ("adequate representation"). Fed. R. Civ. P. 23(a).

A proposed class must also satisfy one of the subdivisions of Rule 23(b). Here, Plaintiff seeks to proceed under Rule 23(b)(3), which requires that "the court find[] that the [common questions] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The relevant factors in this inquiry include the class members' interest in individually controlling the litigation, other litigation already commenced, the desirability (or not) of consolidating the litigation in this forum, and manageability. Fed. R. Civ. P. 23(b)(3)(A)–(D).

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotations omitted). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* The court is "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992). A weighing of competing evidence, however, is inappropriate at this stage of the litigation. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

### III. ANALYSIS

Defendants only challenge the typicality and predominance elements. The Court will analyze all Rule 23(a) and 23(b) requirements but will focus on the contested elements.

### A. Numerosity

"[A] proposed class must be 'so numerous that joinder of all members is impracticable.'" *Rannis v. Recchia*, 380 Fed. App'x 646, 650 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). While "[t]he numerosity requirement is not tied to any fixed numerical threshold[,] . . . [i]n general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Id.* at 651.

Defendants agree they sell the Products to "tens of thousands of consumers in California and throughout the United States." ("Answer," ECF No. 41, at ¶ 16.) Given the large number of potential class members, and that Defendants do not dispute the numerosity of the proposed classes, the Court finds the number of members is sufficiently numerous that joinder is impracticable, and therefore finds this requirement is fulfilled.

### B. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, "[a]ll questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The common contention, however, "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

Plaintiff asserts that a determination on the truth or falsity of Defendants' representation of the Products' efficacy "will resolve an issue that is central to the validity of each one of the claims in one stroke." (Mot. 12 (quoting *Forcellati v. Hyland's, Inc.,* 2014 WL 1410264, at *8, n. 5 (C.D. Cal. Apr. 9, 2014).) The Court agrees and finds that because the Products all convey the same message, an evaluation of this message can be performed on a class-wide basis. Commonality is fulfilled.

### C. Typicality

The class representative's claims or defenses must be typical of those of the class. Fed. R. Civ. P. 23 (a)(3). The Ninth Circuit has explained, "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Staton*, 327 F.3d at 957; *Hanlon*, 150 F.3d at 1019. The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985).

Defendants argue Plaintiff "is subject to a number of unique defenses" and is not typical of the class. (Opp'n 20.) As they did in their motion for summary judgment, Defendants argue Plaintiff lacks standing because she did not rely on the Product label. (Opp'n 20.) The Court found Plaintiff purchased the Product in reliance on the Product's label, among other factors. (MSJ order); *see also Allen v Hyland's Inc.*, 300 F.R.D. 643, 662 (C.D. Cal. 2014) (finding the named plaintiff to be typical when she testified "she relied at least in part on the product's packaging in her decision to buy the product"). The Court also found the fact that Plaintiff may have experienced hair growth while using the Product does not strip her of standing. (MSJ Order.)

Defendants also argue Plaintiff purchased the Product only for her hair, and therefore cannot represent class members who purchased the Products for nails, skin, or energy support. (Opp'n 21.) Plaintiff's specific reason is immaterial; all potential class members were exposed to the same alleged misrepresentation. Plaintiff therefore alleges the same injury as the class members: monetary loss from purchasing a product based on alleged misrepresentations. *See Conde v. Sensa*, No. 14-cv-51-JLS-WVG, 2018 WL 4297056, at *7 (S.D. Cal. Sept. 10, 2018) (finding same). Typicality does not turn on the "specific facts from which [the claim] arose." *Hanon*, 976 F.2d at 508; s*ee Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524,

534 (C.D. Cal. 2011) (holding that "individual experience with a product is irrelevant" because "the injury under the [UCL and CLRA] is established by an objective test . . . [which] states that injury is shown where the consumer has purchased a product that is marketed with a material misrepresentation, that is, in a manner such that 'members of the public are likely to be deceived'"). Typicality is satisfied.

### D. **Adequacy**

Federal Rule of Civil Procedure 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "To determine whether the representation meets this standard, [courts] ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton*, 327 F.3d at 957.

Defendants have not presented any potential conflicts of interest or arguments that Plaintiff or her counsel cannot prosecute the action on behalf of the class. The Court knows of no information that would render Plaintiff or her counsel inadequate. The Court finds Plaintiff and her counsel are adequate.

Plaintiff has satisfied the four requirements of Rule 23(a) and the Court proceeds to analyze the requirements of Rule 23(b)(3). Rule 23(b)(3) states that a class may be maintained if the requirements of Rule 23(a) are fulfilled and if "the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### E. **Predominance of Common Issues**

The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997); *see also* Fed. R. Civ. P. 23(b)(3) (to certify a class, the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members"). "[T]he common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation, brackets and alteration omitted).

Defendants argue Plaintiff cannot establish predominance for three reasons: (1) individual issues regarding the materiality of the Products' labels predominate over common issues; (2) Plaintiff cannot demonstrate the labels are false to all class members; and (3) Plaintiff has no valid class-wide damages model. (Opp'n 11–19.)

### 1. Materiality of Labels

Defendants argue there is no evidence that each member of the class had the same understanding of the Products labels and thus the labels were not material to some purchasers. (*Id.* at 11.) Plaintiff responds that all members purchased the Products "based on false and misleading statements" that the Products provided health benefits and it does not matter "how precisely" the class members interpreted the meaning of the label. (Reply 2–3.)

A misstatement or omission is material if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, No. ML 13-2438 PSG (PLAx), 2017 WL 2559615, at *7 (C.D. Cal. June 7, 2017). In *In re 5-Hour Energy*, the court found the plaintiffs had not sufficiently showed the statements on the product were material because plaintiffs had not produced a consumer survey or research indicating how consumers reacted to the product label. *Id.* at *8. The court also faulted the plaintiffs for failing to produce a common "controlling definition" for the "key term in the alleged misstatement"—energy. *Id.*; *see also In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 577 (C.D. Cal. 2014) (finding no evidence of materiality where the plaintiffs had

produced "no survey evidence concerning the actual reaction of consumers to the" product label). Here, as Defendants point out, it is undisputed that Plaintiff has no survey evidence of how consumers view the Products' labels; therefore Defendants argue Plaintiff cannot prove materiality. But the Court finds such evidence to be unnecessary, and the statement on the label that the Products "support" hair, skin, nails, and energy is material. Without such a statement, no consumer would have a reason to purchase the Products and would otherwise be purchasing a random bottle of supplements without any knowledge of what benefit, if any, the supplements provided. *See Allen v. Similasan Corp.*, 306 F.R.D. 635, 648 (S.D. Cal. 2015) (finding "no consumer would purchase Defendant's Products if they made no efficacy claims. Thus, these efficacy representations are material."). This contrasts with a case where the allegedly false word has no fixed meaning. For example, in *Allen v. Hyland's Inc.*, the plaintiffs argued consumers relied on the product's label that stated it is "100% Natural." 300 F.R.D. 643, 668 (C.D. Cal. 2014). But the court found no evidence that "natural had a fixed meaning" or that "'a significant portion of the general consuming public or of targeted consumers' would rely on the 'natural' label." *Id.* But here, it is logical that consumers would not buy Defendants' Products without relying on the statement that the Products "support" hair, skin, nails and energy, thus they are hoping for some benefit. The messages on Defendants' Products are much clearer than those at issue in *Allen* and *In re 5-Hour Energy*. Therefore, the Court finds the Products' statement is material to a reasonable consumer's purchase.

Further, "reasonable consumer" laws entitle the plaintiff to a class-wide inference of reliance if the plaintiff shows (1) that uniform misrepresentations were made to the class, and (2) that the misrepresentations were material. *Shein v. Canon U.S.A., Inc.*, No. CV 08-7323 CAS (Ex), 2010 WL 3170788, at *7; *see also Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 669 (C.D. Cal. 2009) (same). "Reasonable consumer" statutes also entitle plaintiffs to a class-wide inference of causation if the

plaintiffs can show that the manufacturer's representations were material. *See In re ConAgra Foods, Inc.*, 302 F.R.D. at 571. The claims of Plaintiff's proposed California class are brought under the UCL and CLRA, which follow the reasonable consumer standard. *See Forcellati*, 2014 WL 1410264, at *9 ("For purposes of class certification, the UCL . . . and CLRA are materially indistinguishable."). There is no question that the labels on Defendants' Products are uniform, (*see* ECF No. 54-5 (pictures of Product labels)), and because Plaintiff has sufficiently shown the misrepresentations are material, Plaintiff is entitled to an inference of reliance and causation for her California class.

Plaintiff also proposes certification of a ten-state class and argues "[t]he consumer fraud laws of the Multi-State Class are materially identical to the UCL based on the particular facts and circumstances of this case." (Mot. 20.) But the similarities and differences between the nine states and California is not important due to the below analysis. The Court finds certification is inappropriate for the California class, thus, it is equally inappropriate for the multi-state class.

### 2. Falsity of Labels

Defendants argue not all class members were injured, as some "experienced positive outcomes" from using the Product, for example, if the class member suffered from a biotin deficiency while using the Product, that member would benefit from the Product. (Opp'n 14.)[2]

---

[2] Defendants also argue the class members differ because they may have received a recommendation from a third party to purchase the Product. This argument is a non-starter. No matter what prompted a consumer to go to the store to buy the Product, that consumer was still subjected to the same advertising on the label. *See Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-cv-709-BAC-RBB, 2017 WL 1020391, at *7 (S.D. Cal. Aug. 23, 2017) ("That class members may have learned about [the product] from other sources does not absolve Defendants from liability for false statements that appeared on the labels of the products purchased by the class members."), *rev'd on other grounds* 755 F. App'x 725 (9th Cir. 2019); *Mullins*, 2016 WL 1535057, at *3 ("How consumers first learned about [the product]—from a doctor, parent, Joe Montana, or the packaging—does not matter if 'they nonetheless decided to purchase the product only for its purported health benefits.'").

There are undoubtably common questions in this class. First, there is the question of whether Defendants misrepresented that the Products provide support to one's hair, skin, nails, and energy. Second, if this is found to be true, the trier of fact must determine whether the misrepresentations are likely to deceive a reasonable consumer. Then, as noted above, there are common questions as to reliance and causation.

But Plaintiff's position is that <u>no one</u> in the general population benefits from Defendants' Products because consumers in the general population receive adequate biotin from their diets. This begs the question: what if a class member was not receiving enough biotin from his or her diet before taking the Product? This is possible, as the AI (adequate intake) of biotin is 30 to 35 mcg per day for adults. ("Wolf Report," ECF No. 54-11, at ¶ 21.) And Plaintiff's expert Dr. Wolf admits the AI is an average, so naturally there are people who need more or less than 30 mcg per day. ("Wolf Depo.," ECF No. 69-2, at 90:23–25.) Further, Dr. Wolf opines that the average Western diet contains between 35 to 70 mcg of biotin per day. (Wolf Report ¶ 21.) He concludes that consumers in the general population receive adequate biotin from their diets. But again, this number is an average, and it applies to the general Western population; therefore it is logical that there are potential class members in the United States whose biotin intake is less than 35 mcg per day.

Dr. Wolf agrees that someone not receiving adequate biotin through his or her diet "could probably make up for the deficit with a supplement." (Wolf Depo. at 90:22–91:4.) Of course, Dr. Wolf does not agree that said hypothetical people would need 5,000 to 10,000 mcg of biotin to supplement their diets, as "[t]heir deficit would be very small." (*Id.* at 91:9; *see also* Reply 9 (noting that "at most 105 mcg of biotin supplement would correct any supposed marginal biotin deficiency").) Nor does Dr. Wolf opine that those ingesting below-average levels of biotin "need" supplementation. (*Id.* at 93:21–22.) But, putting all the above information together, it is logical that those people would receive "support" from Defendants' biotin

supplement (maybe an excessive amount but support nonetheless).

Dr. Wolf disagrees and opines that even those who do not ingest enough biotin through their diets still obtain enough biotin due to "biotin recycling." (Wolf Report ¶ 24.) But Dr. Wolf also testified that scientists "don't understand" and are "still learning about" biotin recycling. (Wolf Depo. at 64:4–17.) At this point, no one understands the concept of recycling and scientists "don't have good data about recycling." (*Id.* at 64:17; 157:19–21.) The Court is therefore not convinced by Dr. Wolf's report wherein he definitively states diet and recycling provide everyone with enough biotin. The data shows that while some (or even most) people may receive adequate biotin from their diets, some do not, and there is no evidence that their bodies naturally recycle biotin to make up for the deficiency. In sum, the Court finds that because both Parties agree that "biotin as a nutrient supports healthy hair, skin, nails, and energy," (*id.* at 53:9–17), it is possible that people ingesting below average amounts of biotin would receive support from, and thus would benefit from, Defendants' Products. The Products' labels would therefore not be false as to them.

And further, it is possible that someone with biotinidase deficiency would buy the Product. According to Dr. Wolf, biotinidase deficiency is a "rare inherited disorder . . . that is successfully treated with pharmacological doses of biotin." (Wolf Report ¶ 5.) Those with biotinidase deficiency are "not capable of producing or obtaining enough free biotin and, thus, can develop a cascade of symptoms of biotin deficiency, including hair loss and skin problems." (*Id.* at ¶ 23.) Such people "need huge doses of biotin to stay healthy." (Wolf Depo. at 159:17–19.) Although there are only approximately 4,500 people in the United States with the deficiency, this small group of people "benefit[s] [from] and, in fact, must take high-dose/pharmacological biotin doses." (Wolf Report ¶¶ 22, 26.) Plaintiff agrees that any potential class member with biotinidase deficiency is not injured by Defendants' alleged misrepresentations, (Reply 4), but Plaintiff does not suggest that those with

biotinidase deficiency be excluded from the class.[3] And no party has any evidence whether anyone with biotinidase deficiency purchased the Products. (*Id.* at 5.)

Due to these identified disparities between potential class members, the Court finds individual issues regarding how much, if any, support each class member received from the Products overwhelms the common issues. *See Chow v. Neutrogena Corp.*, No. CV 12-04624 R JCX, 2013 WL 5629777, at *2 (C.D. Cal. Jan. 22, 2013) ("[T]here are significant individualized questions as to whether the product worked as advertised for each individual class member. Resolving this question would necessitate consulting each class member individually to determine if they experienced the advertised result.").

The Court is not finding that Plaintiff must prove the Products are worthless before certification is appropriate. "[P]roof of the manifestation of a defect is not a prerequisite to class certification." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010). Assuming Plaintiff can prove that the Products are worthless to the members of the general population who ingest enough biotin through their diets, the Products do provide some "support" to those who do not, and the label is therefore not false to them.[4] Differentiating between the various types of people and determining how much, if any, benefit each person receive from the Products

---

[3] Instead, Plaintiff includes alterations in her damages calculation for any potential class member with biotinidase deficiency. Damages are addressed below.

[4] This case is also not about whether certain consumers experienced health benefits while taking the Product. Whether or not class members experienced, for example, hair growth or stronger nails during the period he or she used the Product is immaterial. *See Mullins v. Premier Nutrition Corp.*, No. 13-cv-1271-RS, 2016 WL 1535057, at *3 (N.D. Cal. Apr. 15, 2016) ("That some people believe [the Product] provides benefits as advertised is beside the point. [Plaintiff's] claims do not rise or fall on whether individual consumers experienced health benefits, due to the placebo effect or otherwise. They rise or fall on whether [Defendants'] representations were deceptive."); *Forcellati*, 2014 WL 1410264, at *9 (holding that if the plaintiff could prove allegations that the products' effectiveness is solely a placebo effect, "Defendants' representations about the products' effectiveness would constitute false advertising 'even though some consumers may experience positive results'" (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1100 (9th Cir. 1994))). What is material is whether the consumers <u>actually receive</u> "support" (as is promised on the Product label) while taking the Product.

would overwhelm the common issues in this case. For this reason, predominance is not satisfied.

### 3. Damages

Finally, Defendants argue Plaintiff has no valid class-wide damages model. (Opp'n 16.) Under the predominance inquiry, plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Plaintiff must present a damages model consistent with her theory of liability—that is, a damages model "purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id.* at 35. "Calculations need not be exact," *id.*, nor is it necessary "to show that [the] method will work with certainty at this time." *Khasin v. R.C. Bigelow, Inc.*, No. 12-cv-2204-WHO, 2016 WL 1213767, at *3 (N.D. Cal. Mar. 29, 2016) (citation omitted).

Plaintiff's damages model involves "multiplying either the retail sales price times units sold or, more conservatively, multiplying wholesale prices times units sold." (Reply 7.) Plaintiff's theory is that the Products are 100% worthless, thus, consumers should get 100% of their money back. (*See id.* at 8.) Plaintiff also claims her damages model accounts for class members with rare genetic disorders who purchased the Products or those who might be "marginally deficient." (*Id.*) Plaintiff intends to reduce "the aggregate damages amount by 1% to account for any Class members in the 0.00138% [of the U.S. population who have biotinidase deficiency] who purchased the Products." (*Id.* at 9.)

If a product is proven to be completely worthless and provides no value whatsoever to the class members, "the putative class will be entitled to restitution of the full amount they paid for the product." *Korolshteyn*, 2017 WL 1020391, at *7; *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *10 (N.D. Cal. May 11, 2017) ("Under California law, a full refund may be available as a means for restitution only when plaintiffs prove the product had *no*

value to them."). If every class member had no use for any additional biotin outside his or her diet, then the Products would simply be worthless pills. This is not a case where the Products provide some value separate and apart from what is allegedly falsely advertised. *See e.g.*, *Khasin*, 2016 WL 1213767, at *3 (declining to assign a $0 value to the green tea product because even if the product did not contain antioxidants as advertised, consumers still gained a "benefit in the form of enjoyment, nutrition, caffeine intake, or hydration from consuming the teas"). But, as noted above, it is possible some class members receive some benefit (i.e. "support" to their hair/skin/nails/energy) from the Product. Even if biotin is essentially snake oil for many people, as Plaintiff presents, a class member ingesting below-average levels of biotin would benefit from the biotin supplement. Again, the person may need only, for example, 10 mcg per day, and although the Product provided him or her 5,000 mcg per day, this is a benefit nonetheless. What dollar value should the Court place on the benefit that person receives? Plaintiff has not proven that subtracting 1% from each purchase price is adequate to make up for the value of the benefit some class members may receive. Plaintiff therefore has not presented a damages model consistent with her theory of their case, because even under Plaintiff's theory, some people benefitted from the Products. Therefore, damages are not subject to common proof on a class-wide basis. For this reason, predominance is not satisfied.

### F. <u>Superiority</u>

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. "This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Id.* Here, each member of the class pursuing a claim individually would burden the judiciary and run afoul of Rule 23's focus on efficiency and judicial economy. *See Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 946 (9th Cir. 2009) ("The overarching focus remains whether trial by class representation would further the goals of

efficiency and judicial economy."). Further, litigation costs would likely "dwarf potential recovery" if each class member litigated individually. *Hanlon*, 150 F.3d at 1023. The Products cost only approximately $5 to $15. (Mot. 22.) "[W]here the damages each plaintiff suffered are not that great, this factor weighs in favor of certifying a class action." *Zinser,* 253 F.3d at 1199 n. 2 (quoting *Haley v. Medtronic, Inc.,* 169 F.R.D. 643, 652 (C.D.Cal.1996)). Superiority is satisfied.

## IV. CONCLUSION

Because Plaintiff has failed to meet the predominance requirement under Rule 23(b)(3), the Court **DENIES** Plaintiff's Motion for Class Certification. (ECF No. 54.)

**IT IS SO ORDERED.**

**DATED: May 22, 2019**

Hon. Cynthia Bashant
United States District Judge